UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| SARAH J. BRIGHTMON,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration,<br><br>        Defendant. | Case No. EDCV 06-1258 AJW<br><br>MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural history of this case, which is summarized in the Joint Stipulation. [See JS 2]. In a written hearing decision that constitutes the final decision of the Commissioner, an administrative law judge ("ALJ") found that plaintiff had severe impairments consisting of degenerative joint disease, hypertension, vision deficit, and residuals of a stroke, but that she not disabled because she retained the residual functional capacity ("RFC") to perform work available in significant numbers in the national economy.[See JS 2; Administrative Record ("AR") 19-21].

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Discussion**

**Medical opinion evidence**

Plaintiff contends that the ALJ erred in evaluating the opinion of her treating orthopedist, Dr. Doty, and the Commissioner's consultative psychiatrist, Dr. Fontana. [JS 3-4, 8-10].

**Dr. Doty**

Plaintiff argues that the ALJ did not expressly indicate whether he was accepting or rejecting Dr. Doty's opinion and did not provide specific, legitimate reasons for rejecting Dr. Doty's opinion.

Dr. Doty opined that plaintiff was precluded from "heavy work as well as from prolonged sitting or prolonged weightbearing." [JS 3-4; AR 431]. Dr. Doty based his opinion on plaintiff's x-ray and MRI findings, lumbar spine tenderness, positive seated and supine straight leg raising tests, bilaterally, and positive Lasegue's test on the left.[1] [AR 431]. Dr. Doty also opined that plaintiff had a "further limitation due to her recent stroke," but he deferred an opinion on her stroke-related impairments to an appropriate specialist. Dr. Doty added that in view of plaintiff's "status post CVA" (cerebral vascular accident), "she

---

[1] A positive straight leg raising test or positive Lasegue's sign is indicative of pain produced in the sciatic nerve distribution of the opposite leg, as with lumbar disc rupture on the same side as the pain. 2 Dan J. Tennenhouse, M.D., J.D., F.C.L.M., Attorneys' Medical Deskbook 4th § 18:4 (2008).

is not an appropriate candidate for spinal surgery at this time, nor is she likely to be in the future. Absent this procedure, I have nothing to offer the patient with regard to her lumbar spine condition." [AR 431].

The ALJ discussed Dr. Doty's findings and opinion. [AR15]. The ALJ implicitly rejected Dr. Doty's prohibition against "prolonged sitting" by finding that plaintiff could sit for six hours in an eight-hour day; however, he did not articulate specific reasons for doing so.  [AR 20].

Although not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007)(citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). The preference for treating physician opinions is founded on the recognition that "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual. . . ." Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) and citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188)).

When a treating physician's medical opinion as to the nature and severity of an individual's impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion must be given controlling weight. Orn, 495 F.3d at 631-632; Edlund, 253 F.3d at 1157; SSR 96-2p, 1996 WL 374188 SSR 96-2p, 1996 WL 374188, at *1-*2. A treating physician's opinion that is contradicted by substantial evidence in the record, such as the opinion of an examining physician based on independent clinical findings, is not entitled to controlling weight; however, that opinion is "still entitled to deference" and should be evaluated using the factors set forth in the Commissioner's regulations. Orn, 495 F.3d at 632 (quoting SSR 96-2p at 4); see Edlund, 253 F.3d at 1157; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).[2] If

---

[2]  Those factors include the length of the treatment relationship, the frequency of examination by the treating physician, and the nature and extent of the treatment relationship between the patient and the treating physician. Additional factors relevant to evaluating any medical opinion include the degree to which the opinion is supported by other evidence in the record, the "quality of the explanation provided" by the physician, the consistency of the medical opinion with the record as a whole, the physician's speciality, and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Orn,495 F.3d at 631; 20 C.F.R. §§ 404 .1527(d)(2)-(6),  416.927(d)(2)-(6).

1    contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific
2    and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec.
3    Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d
4    821, 830-831 (9th Cir. 1995).

5           Although Dr. Doty's functional assessment was rendered in the context of plaintiff's workers'
6    compensation claim, the ALJ was not free to disregard his opinion without legally sufficient reasons. See
7    Booth v. Barnhart, 181 F.Supp.2d 1099, 1105-1109 (C. D. Cal. 2002) (discussing the principles governing
8    the evaluation of workers' compensation medical reports). Defendant contends that the ALJ "stated that
9    because Dr. Doty's report did not provide specific information about Plaintiff's functional limitations, he
10   relied on other substantial evidence in the record to find that Plaintiff could perform a range of light work."
11   [JS 5 (citing AR 16)]. What the ALJ actually wrote was this: "Dr. Doty, the claimant's Worker's
12   Compensation treating source, has stated that the claimant should be precluded from heavy work as well
13   as from prolonged sitting or prolonged weightbearing. The claimant's treating medical sources have
14   *otherwise* provided no specific assessment of her functional limitations." [AR 16 (italics added)]. Dr. Doty,
15   however, did provide a specific assessment of plaintiff's functional limitations. The ALJ said he said that
16   he was basing his RFC finding on the opinion of the nonexamining medical expert, Dr. Landau, but he never
17   explained why he found Dr. Landau's opinion more credible than Dr. Doty's conflicting treating source
18   opinion.

19          Defendant's argument, in effect, is that the ALJ's RFC finding is based on examining and non-
20   examining source opinions that constitute substantial evidence, and that is enough justification for rejecting
21   Dr. Doty's opinion. [See JS 6-7]. Treating source opinions, however, cannot be rejected solely because the
22   record contains a conflicting examining source opinion that otherwise would constitute substantial evidence
23   supporting the ALJ's decision. See Orn, 495 F.3d at 632-633 ("Even if the treating doctor's opinion is
24   contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and
25   legitimate reasons' supported by substantial evidence in the record.")(quoting Reddick, 157 F.3d at 725).

26          The fact that Dr. Doty is not a specialist in the treatment of stroke is not a ground for discrediting
27   his opinion. Dr. Doty confined his opinion to his area of expertise, and he opined that plaintiff's orthopedic
28   limitations alone would preclude her from prolonged sitting or weightbearing, regardless of any further

1 limitations attributable to her stroke. Further, Dr. Landau, the medical expert on whose testimony the ALJ
2 relied, is an internist with a subspecialty in cardiovascular disease. [AR 54]. Dr. Landau's specialty is less
3 relevant to plaintiff's orthopedic impairment's than Dr. Doty's, and Dr. Landau is not a neurologist, the
4 specialty most germane to the treatment of stroke. See 1 Dan J. Tennenhouse, M.D., J.D., F.C.L.M.,
5 Attorneys' Medical Deskbook 4th § 7:26 (2008)(stating that a neurologist specializes in diagnosis and
6 treatment of disorders of the nervous system, including treatment of stroke).

7 The ALJ indicated that he credited Dr. Landau's testimony that plaintiff "was heavily medicated,
8 which likely accounted for her stroke symptoms. He noted that these symptoms went away when
9 medications were adjusted."[3] [AR 17]. Nonetheless, the ALJ found that plaintiff's severe impairments
10 included "residuals of a stroke in March 2004." [AR 20]. The ALJ did not take steps to clarify any
11 ambiguity in the record regarding whether or not plaintiff actually suffered a stroke, nor did he resolve the
12 apparent inconsistency between his finding that plaintiff had severe residuals of a stroke in March 2004 and
13 Dr. Landau's testimony.

14 **Dr. Fontana**

15 Plaintiff contends that the ALJ erred in failing to indicate whether he accepted or rejected the
16 opinion of Dr. Fontana, the Commissioner's consultative psychiatrist, who opined that plaintiff "should be
17 able to perform simple and repetitive tasks, but could have difficulty with more detailed and complex tasks."
18 [AR 17, 401]. Dr. Fontana also opined that plaintiff should be able to accept instructions from supervisors,
19 interact with coworkers and the public, perform work activities on a consistent basis without additional
20 supervision, maintain regular attendance in the workplace, and complete a normal workday and work week.

---

[3] Dr. Landau testified that

> there's no evidence, real evidence of a stroke. [Plaintiff] had a head CT which didn't show any evidence of a stroke. Her examinations don't show evidence of a stroke. When she had her episode that was ultimately repeated over and over again in the records as a stroke, what actually happened was that [plaintiff] was very heavily medicated. And she showed up in the emergency room with slurred speech, and the diagnostics evaluation was stroke versus medication effect. And she seemed to recover when the medications were withdrawn.

[AR 571].

[AR 402].[4]

The ALJ summarized Dr. Fontana's findings and conclusions, including the portion of his opinion quoted above. [AR 17]. The ALJ noted that plaintiff's "treating mental health source has provided no statement assessing [plaintiff's] specific functional limitations, and has reported no significant objective findings." [AR 18]. The ALJ then found that "*[c]onsidering the degree of limitation of mental functions as stated by Dr. Fontana*," plaintiff had a moderate limitation of her ability to understand, remember, and carry out detailed instructions, but no other significant mental limitations. [AR 17 (italics added)]. Based on Dr. Landau's testimony, the ALJ also found that plaintiff could not perform "steady high-degree production or fast-paced work." [AR 18]. The alternative jobs identified by the ALJ were unskilled jobs with a specific vocational preparation level of 2.[5] Nothing in the record suggests that those jobs were incompatible with the mental functional limitations found by the ALJ.

The ALJ's decision makes it clear that the ALJ considered and accepted Dr. Fontana's opinion, which the ALJ reasonably interpreted to impose a moderate limitation regarding the performance of detailed tasks. Therefore, plaintiff's contention that the ALJ erred in evaluating Dr. Fontana's opinion lacks merit.

**Credibility findings**

---

[4] In her reply, plaintiff argues that the ALJ erred because he failed to comment on each one of Dr. Fontana's mental status examination *findings*, such as plaintiff's response to the "spilled milk proverb" or the "lost letter question." [JS 10; see AR 401]. The ALJ's burden is to articulate reasons for rejecting a treating or examining source o*pinion*. See Orn, 495 F.3d at 632-633. One factor bearing on the weight of a medical opinion is the degree to which the opinion is supported by relevant evidence, "particularly medical signs and laboratory findings . . . ." 20 C.F.R. § 404.1527(d)(3). The ALJ is not obliged to comment on particular clinical findings, nor is the ALJ competent to interpret the functional significance of such findings. It is the clinician's job to interpret the findings and render an opinion. The ALJ adequately considered and incorporated into his RFC finding Dr. Fontana's opinion (as stated in the "Functional Assessment/Medical Source Statement" of Dr. Fontana's report). More than that was not required.

[5] The term "specific vocational preparation" ("SVP") is a term of art used in the Dictionary of Occupational Titles ("DOT") to classify "how long it generally takes to learn the job." See 20 C.F.R. §§ 404.1468(a), 416.968(a); Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). Unskilled jobs are those that can usually be learned in 30 days or less, corresponding to an SVP level of 1 ("[s]hort demonstration only") or 2 ("[a]nything beyond short demonstration up to and including 1 month"). DOT, Appendix C, "Components of the Definition Trailer" (4th ed. 1991); see Terry, 903 F.2d at 1276 (holding that unskilled jobs are those that have an SVP of 30 days or less); SSR 83-10, WL 31251, at *7 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").

6

1    Plaintiff contends that the ALJ failed to make proper credibility findings regarding her subjective
2 testimony and that of her husband, Ricky Brightmon. [JS 10-18].
3    Both plaintiff and her husband testified during the hearings in December 2004 [AR 544-565] and
4 April 2005. [AR 566-591]. Plaintiff was not represented by counsel during either hearing.

**December 2004 hearing**

6    On examination by the ALJ, plaintiff testified that she stopped working as a custodian when she was
7 hurt on the job in November 2001. She received a $64,000 workers' compensation settlement. She said that
8 her back pain began when she was injured, had gotten worse, and prevented her from working. [AR 549-
9 551]. Plaintiff testified that she had received some injections in 2002 that helped for awhile. [AR 552]. She
10 agreed that it was a "fair statement" that she could lift no more than 20 pounds occasionally and ten pounds
11 "more frequently." [AR 552]. She agreed with the assessment that she could not be on her feet all day long
12 and could be on her feet for 45 minutes and then sit for 15 minutes. [AR 553]. She testified that she had
13 vision problems. She could read a newspaper but had "blind spots" off to the right in her right eye. [AR
14 551-552].
15    On a typical day, plaintiff said, she remained in bed watching television. [AR 553]. She lived with
16 her husband and her daughter and son, ages 29 and 28. [AR 553]. Her children worked. [AR 554]. Her
17 husband, who said he was "totally disabled" and received SSI benefits, did not. [AR 554]. Asked whether
18 she had to take care of her husband during the day, she responded, "Sort of like opposite way." [AR 554].
19 She said that her husband helped her cook the meals and wash the clothes "because I can't do it." [AR 555].
20 The ALJ's next question was "You can't bend at all?" [AR 555]. Plaintiff replied, "It hurts." [AR 555].
21 The ALJ then asked, "So you have to bend slowly and carefully?" and "[Y]ou only [bend] when you have
22 to?" [AR 555]. Plaintiff answered "Yeah" to both questions. [AR 555].
23    The ALJ next asked plaintiff whether it was a "fair statement" to say that she could do work that
24 "didn't require you to lift more than 20 pounds occasionally and 10 and under frequently, and you didn't
25 have to do hardly any bending? And you didn't have to be on your feet all day long. Would that be a fair
26 statement?" [AR 55]. Plaintiff said "No" because she got short of breath doing "cleaning around the house."
27 [AR 556]. The ALJ asked whether it was "the odors that you smell," and plaintiff replied, "The odors,
28 yeah." [AR 556]. She agreed that if she did not smell any strong odors, she did not have shortness of breath,

and that she needed an environment where she did not have exposure to strong odors. [AR 556-557].

Plaintiff testified that she was taking medication for her heart, blood pressure, depression, and pain. [AR 556-557]. She said that her stroke occurred eight months earlier and limited her because she could use her right arm just "a little bit." [AR 557-558]. Asked if her right hand had gotten better, she said, "It's getting a little, just a little bit." [AR 558]. The ALJ asked if she could use it to eat with, and plaintiff, who is right-handed, said "No." [AR 558]. The ALJ asked, "Is there anything that you used to use your right hand for that you don't use it for now?" [AR 558]. Plaintiff said "No." [AR 558]. The ALJ followed up by asking, "So you just have to be — are you just slower now?" [AR 559]. Plaintiff answered, "Just slower." [AR 559].

After plaintiff's husband was sworn, the ALJ remarked "Oh, by the way, let me ask you this. She — your wife seems a little slowed down today in her responses. Has she been that way since the stroke? [AR 560]. Mr. Brightmon said, "Yes, sir." [AR 561]. He testified that plaintiff had not been that way before the stroke, but that "[s]ince the stroke she's like she just don't — she don't say nothing. She just sits there and stares at me all day. I kind of wish I had the old Sarah back." [AR 561]. After taking some testimony from the vocational expert, the ALJ said to Mr. Brightmon, "I understand that she doesn't really use her — she's really slowed down a lot more?" [AR 563]. Mr. Brightmon replied, "She doesn't even use her voice. That's what scares me. She don't say nothing. She just sits there and stares at you. You know, [I] have to try to make her laugh or do something funny, and I'm not that funny." [AR 563]. The ALJ asked, "But she still helps you cook the meals?" [AR 563]. Mr. Brightmon replied, "Not actually. I do the cooking, the washing the clothes." [AR 564]. He added that plaintiff "can't use [her right hand] that good." [AR 564]. He said that she sometimes had trouble holding a sandwich and trying to eat it. [AR 564]. He also said that plaintiff could use a spoon and fork to eat "a little bit" and "slowly." [AR 564]. He testified that he had to dress his wife because she could not bend over to get her feet in her pants or put her underwear on, could not pull shirts or gowns over her head, and had trouble buttoning things. [AR 565].

///

**April 2005 hearing**

During the April 2005 hearing, the ALJ first elicited testimony from Dr. Landau, the medical expert. [AR 568-572]. He then took testimony from Mr. Brightmon, who said he was "trying to figure out what

8

[Dr. Landau] meant by she didn't have a stroke." [AR 572]. Mr. Brightmon said that the doctor told plaintiff she had a stroke in or around March 2004. [AR 572]. He said that he had been trying to get her help but "can't afford to do nothing for her, really. . . . And they still — she's not doing nothing like she normally did. This is not my wife, and I know it's not my wife." [AR 573]. He reiterated that plaintiff "don't talk, She don't say nothing. She don't — she can't put her clothes on or nothing else. I mean, I'm 51. I can put my clothes on. She's the same age as I am, and she still can't do it now." [AR 573]. Mr. Brightmon said that plaintiff's doctors "keep giving her the same medication" and had even increased some of them. He said that plaintiff was supposed to have an appointment at the county hospital some time the following month. [AR 573].

The ALJ asked plaintiff only one question, about her weight. She said she weighed about 210 pounds. [AR 582].

Once a disability claimant produces evidence of an underlying physical or mental impairment that is reasonably likely to be the source of her subjective symptoms, the adjudicator is required to consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). Although the ALJ may then disregard the subjective testimony he considers not credible, he must provide specific, convincing reasons for doing so. Tonapetyan, 242 F.3d at 1148; see also Moisa, 367 F.3d at 885 (stating that in the absence of evidence of malingering, an ALJ may not dismiss the subjective testimony of claimant without providing "clear and convincing reasons"). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885. If the ALJ's interpretation of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In evaluating subjective symptom testimony, the ALJ must consider "all of the evidence presented," including the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors, such as movement, activity, and environmental conditions; (4) the type, dosage, effectiveness and adverse side effects of any pain

1  medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) any other
2  measures used by the claimant to relieve pain or other symptoms; and (7) other factors concerning the
3  claimant's functional restrictions due to such symptoms. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3);
4  see also Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (clarifying the Commissioner's
5  policy regarding the evaluation of pain and other symptoms).  The ALJ also may employ "ordinary
6  techniques of credibility evaluation," considering such factors as (8) the claimant's reputation for
7  truthfulness; (9) inconsistencies within the claimant's testimony, or between the claimant's testimony and
8  the claimant's conduct; (10) a lack of candor by the claimant regarding matters other than the claimant's
9  subjective symptoms; (11) the claimant's work record; and (12) information from physicians, relatives, or
10 friends concerning the nature, severity, and effect of the claimant's symptoms.  See Light v. Social Sec.
11 Admin., 119 F.3d 789, 792 (9th Cir. 1997); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

12       The ALJ summarized plaintiff's testimony [AR 16], but his summary is somewhat inaccurate and
13 misleading.  For example, he said that plaintiff estimated that she could lift ten pounds frequently or twenty
14 pounds occasionally. [AR 16].  As noted above, plaintiff endorsed the ALJ's statement that she could lift
15 twenty pounds occasionally and ten pounds "more frequently," but the ALJ did not explain to her what he
16 meant by occasionally, frequently, or "more frequently."  "Occasionally" and "frequently" are Social
17 Security terms of art whose precise meanings an unrepresented disability claimant cannot be presumed to
18 know, while "more frequently" is so vague as to be meaningless.  The ALJ also said that plaintiff's "stroke
19 some eight months earlier has affected her right side," but that she is able to use her right hand to eat. [AR
20 16].  Plaintiff, however, testified that she could not use her right hand to eat, and her husband corroborated
21 that testimony. [AR 558, 564].

22       Moreover, the ALJ did not provide specific, convincing reasons for rejecting the alleged severity
23 of plaintiff's back pain, stroke residuals, and functional limitations.  In his formal numbered findings, he
24 states that plaintiff's "allegations regarding her limitations are not totally credible for the reasons set forth
25 in the body of the decision" [AR 20], but his decision does not set forth specific reasons.  The failure to
26 make a clear, fully-supported credibility finding is of special concern in the circumstances of this case.
27 Plaintiff was not represented by counsel, and the hearing transcripts indicate that plaintiff seemed to have
28 trouble understanding and responding to some questions, or only did so after prompting or leading by the

1  ALJ. For example, plaintiff endorsed the ALJ's suggestion that she could not wash clothes without help
2  because of difficulty bending and became short of breath cleaning the house because of odors, even though
3  plaintiff did not indicate that bending or odors were the source of those limitations until prompted by the
4  ALJ. The ALJ did not ask plaintiff open ended questions that might have encouraged her to elaborate or
5  describe her limitations in her own words. The ALJ even observed during the hearing that plaintiff seemed
6  slow in her responses to questions.

7  Regarding Mr. Brightmon's testimony, the ALJ said that it was "essentially corroborative." [AR 16].
8  That is only partly true. For example, Mr. Brightmon substantially corroborated plaintiff's testimony that
9  she could not use her right hand to eat by testifying that she could use her right hand for eating only a little
10  bit and slowly. [AR 558, 564]. The ALJ, however, did not accurately summarize that testimony. Mr.
11  Brightmon's testimony also is not simply corroborative in the sense that he indicated that plaintiff was more
12  limited than her testimony suggested and that her functional abilities had diminished markedly since her
13  stroke (or possible stroke). For example, he testified that she did not help him with cooking or laundry,
14  needed help to get dressed, and that her demeanor had changed noticeably.

15  Under Ninth Circuit law, "[t]he ALJ is required to account for all lay witness testimony in the
16  discussion of his or her findings." Robbins, 466 F.3d at 885. "[W]here the ALJ's error lies in a failure to
17  properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the
18  error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the
19  testimony, could have reached a different disability determination." Stout, 454 F.3d at 1056. It is not clear
20  that no reasonable ALJ could have reached a different disability determination if Mr. Brightmon's testimony
21  is fully credited. The ALJ's failure to make properly supported credibility findings is reversible legal error.[6]

22  **Remedy**

23  The choice whether to reverse and remand for further administrative proceedings, or to reverse and
24  simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th
25  Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of
26  benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038

---

[6] This disposition makes it unnecessary to consider plaintiff's additional contention that the ALJ erroneously failed to consider plaintiff's nephew's lay witness testimony.

(2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Moisa, 367 F.3d at 886 (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)). A district court, however,

> should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178).

The ALJ did not properly evaluate Dr. Doty's opinion, but since Dr. Doty did not opine that plaintiff was totally unable to work and declined to assess the effects of any stroke, it is not clear that crediting that opinion would require an award of benefits. There is unresolved ambiguity in the medical record regarding the occurrence, severity, and functional effects of any stroke suffered by plaintiff. Although the ALJ clearly did not make legally sufficient credibility findings, augmentation of the record concerning plaintiff's stroke also may affect the credibility analysis. At the record stands, it cannot be said that an award of benefits is required. Therefore, the proper course is a remand for further proceedings.

On remand, the ALJ is directed to recontact plaintiff's treating sources and take other appropriate steps to augment and clarify the record, conduct a supplemental hearing, and issue a new hearing decision that includes legally sufficient findings.

///

///

///

**Conclusion**

For the reasons stated above, the Commissioner's decision is not supported by substantial evidence and does not reflect application of the proper legal standards. Accordingly, the Commissioner's decision is **reversed, and the case is remanded for further administrative proceedings** consistent with this memorandum of decision.

**IT IS SO ORDERED.**

DATED: March 6, 2008

/ s /
_____
ANDREW J. WISTRICH
United States Magistrate Judge